[Cite as *In re P.L.H.*, 2021-Ohio-3522.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## GREENE COUNTY

IN THE MATTER OF: P.L.H.

:
:
:
:    Appellate Case No. 2021-CA-6
:
:    Trial Court Case No. C0049012
:
:    (Appeal from Common Pleas Court-
:    Juvenile Division)
:
:

. . . . . . . . . . .

# O P I N I O N

Rendered on the 1st day of October, 2021.

. . . . . . . . . . .

DALMA C. GRANDJEAN, Atty. Reg. No. 0024841 and JAMES D. MILLER, Atty. Reg. No. 0080357, 1 South Main Street, Suite 1590, Dayton, Ohio 45402
    Attorneys for Appellant Father

APRIL H. MOORE, Atty. Reg. No. 0084711, 1354 North Monroe Drive, Suite B, Xenia, Ohio 45385
    Attorney for Appellee Grandmother

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Appellant, R.H. ("Father"), appeals from a judgment awarding legal custody of his daughter, P.L.H., to a non-parent relative, Appellee Grandmother, who is P.L.H.'s maternal grandmother. In a single assignment of error, Father contends that he is a suitable parent and that the juvenile court abused its discretion by awarding legal custody of P.L.H. to Grandmother.

{¶ 2} We conclude that the evidence supported the court's decision that returning the child to Father would be detrimental to her. The court, therefore, did not act arbitrarily, unreasonably, or unconscionably, and the judgment will be affirmed.

## I. Facts and Course of Proceedings

{¶ 3} On June 22, 2018, Grandmother filed a complaint in the juvenile court seeking legal custody of P.L.H., who had been residing with Grandmother since May 2016 pursuant to a grandparent's power of attorney ("POA") that Father had filed with the Greene County Juvenile Court. The complaint also sought interim custody, child support, and other relief. At the time, Father lived in Tennessee.

{¶ 4} The court informed the parties that a hearing on the complaint would be held on August 6, 2018. Father's attorney then filed a notice of appearance with the court on July 12, 2018. However, on July 30, 2018, Father revoked the POA. At the time, P.L.H. was visiting with Father in Tennessee.

{¶ 5} After learning that Father had enrolled P.L.H. in school in Tennessee and would not be returning her to Ohio, Grandmother filed an ex parte/emergency motion on July 31, 2018, asking the court to order Father to return P.L.H. to Ohio. On the same day, the court ordered Father to immediately return the child to Ohio and to her

grandmother.    Father opposed the motion in a memorandum filed on July 31, 2018, but he did not return P.L.H. to Ohio as the court had ordered.

{¶ 6} After hearing testimony from the parties on August 6, 2018, a magistrate filed an order stating that Grandmother would have interim custody of P.L.H. and would be allowed to pick up P.L.H. at Father's home in Tennessee that day.   The magistrate further ordered visitation for Father and scheduled a contested hearing for October 22, 2018.   A guardian ad litem ("GAL") was then appointed on August 7, 2018.

{¶ 7} On August 27, 2018, Father filed a motion asking the court to set aside the magistrate's decision.   Father also filed objections to the magistrate's decision.   The juvenile court denied Father's objections on September 26, 2018.

{¶ 8} After conducting an investigation, the GAL recommended that legal custody be granted to Grandmother and that Father be given visitation.   GAL Report (Oct. 16, 2018).   The magistrate then held a contested custody hearing on April 22, 2019, and took the matter under advisement.   On August 5, 2019, the magistrate issued a decision granting Grandmother legal custody of P.L.H., based on a finding that awarding Father custody would be detrimental to P.L.H.   Father filed objections to the magistrate's decision on August 9, 2019.   On October 2, 2019, the magistrate issued a corrected decision making the same findings, and Father objected to that decision as well.   After all responses and objections had been submitted, the juvenile court overruled Father's objections on April 14, 2020, and granted Grandmother legal custody of P.L.H.

{¶ 9} Father appealed on May 6, 2020, but we dismissed the appeal for lack of a final appealable order.   However, we stated that Father could appeal again after entry of a final order.   *See S.R. v. R.H.,* 2d Dist. Greene No. 2020-CA-19 (Decision & Entry, Nov.

4, 2020). On remand, the juvenile court filed an amended judgment overruling the objections to the magistrate's decision, and Father filed another notice of appeal on March 15, 2021. After expediting the appeal, we filed a show cause order on April 29, 2021, based on Father's failure to transmit the record. Father then caused the record to be filed in May 2021 and filed his brief on May 21, 2021.

{¶ 10} Subsequently, we issued another show cause order, based on Grandmother's failure to timely file a brief; she responded by asking for an extension of time. At that point, we granted an extension and deemed our show cause order satisfied. Grandmother then filed her brief on July 29, 2021.


## II. Abuse of Discretion

{¶ 11} Father's sole assignment of error states that:

The Trial Court Abused Its Discretion by Awarding Legal Custody of the Minor Child, P.L.H., to a Non-Parent Relative.

{¶ 12} Father contends that the juvenile court abused its discretion in awarding legal custody to Grandmother because, in non-parent custody disputes, courts are required to award custody to the parent unless the parent is unsuitable. According to Father, the juvenile court could not have found him unsuitable because he had stable housing, stable employment, maintained health insurance for P.L.H., had a bond with P.L.H., and he and P.L.H. had an established relationship and family ties.

{¶ 13} In reviewing legal custody decisions, we will reverse only if the lower court has abused its discretion. *In re I.R.*, 2d Dist. Montgomery No. 28160, 2019-Ohio-2037, ¶ 7. An abuse of discretion "implies that the court's attitude is unreasonable, arbitrary or

unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). However, "most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue de novo, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result." *Id.*

{¶ 14} Where a child custody proceeding is "between a parent and a nonparent, the hearing officer may not award custody to the nonparent without first making a finding of parental unsuitability[,] that is, without first determining that a preponderance of the evidence shows that the parent abandoned the child, that the parent contractually relinquished custody of the child, that the parent has become totally incapable of supporting or caring for the child, or that an award of custody to the parent would be detrimental to the child." *In re Perales*, 52 Ohio St.2d 89, 369 N.E.2d 1047 (1977), syllabus. *See also I.R.* at ¶ 8.

{¶ 15} "If a court concludes that any one of these circumstances describes the conduct of a parent, the parent may be deemed unsuitable, and the state may infringe upon the fundamental parental liberty interest of child custody." *In re S.M.*, 160 Ohio App.3d 794, 2005-Ohio-2187, 828 N.E.2d 1044, ¶ 11 (8th Dist.). Notably, the focus of the last prong (that custody to the parent would be detrimental) is on "the harmful effect of the [parental] custody on the child, rather than [on] * * * society's judgment of the parent

* * *." *Perales* at 98. As we have stressed, under *Perales*, the court's "focus must be on the detriment, or harm, to the child, as opposed to a value judgment about [the parent's] morality, character, or lifestyle." *In the Matter of R.R.S.*, 2d Dist. Greene No. 2016-CA-25, 2018-Ohio-990, ¶ 8.

{¶ 16} In concluding that custody should be given to Grandmother, the magistrate made numerous findings of fact. Among other things, the magistrate noted that, before coming to live with Grandmother, P.L.H. had "exhibited severe behaviors, including being aggressive toward animals and other students, having difficulty expressing her emotions and communicating, and being defiant. She was further struggling academically." Magistrate's Decision (Aug. 5, 2019), p. 2; Corrected Magistrate's Decision (Oct. 2, 2019, p. 2). However, under Grandmother's care, P.L.H. was "thriving" and "making progress socially, emotionally and academically. She is engaged in extra-curricular activities and is happy." *Id.* The magistrate also noted the GAL's testimony that returning to Father's home would be detrimental "due to Father's lack of involvement in the child's care for over 2 years, the Father's lack of awareness of the child's needs and the progress she has made in her grandmother's care, as well as the child's troubled relationship with her stepmother." *Id.*

{¶ 17} Based on these facts and others, and after discussing the *Perales* standards, the magistrate concluded that returning P.L.H. to Father would have a harmful effect on P.L.H. After Father objected to the magistrate's decision, the juvenile judge agreed that removing P.L.H. and returning her to Father would have a harmful effect on P.L.H. Amended Judgment Entry (Feb. 17, 2021), p. 4. The judge echoed the magistrate's concerns and added that:

Also of paramount concern is the fact that [Father] retrieved [P.L.H.] in August 2018, with the intent to keep [P.L.H.] and not return her. [P.L.H.] had services in place, an IEP, a school she was comfortable attending, and [Father] was willing to remove her from this environment where by his own admission, she was doing well, without notice. That is of paramount concern to this Court.

*Id.* at p. 6.

{¶ 18} After reviewing the record, we conclude that the juvenile court's decision was supported by the evidence and by sound reasoning, and that there was no abuse of discretion.

{¶ 19} In challenging the court's decision, Father argues, by referring to cases involving physical abuse or other egregious conduct, that a parent's fundamental right to custody cannot be disturbed. He further contends that an abuse of discretion occurs when a trial court simply concludes that a non-parent may be " 'better suited' " than a parent. Appellant's Brief, p. 15. However, that is not what occurred here.

{¶ 20} As a preliminary point, P.L.H. is not an ordinary child. Instead, she is a child with special needs. Beginning in preschool, P.L.H. exhibited behavioral problems. Transcript of Proceedings ("Tr."), p. 190. Also, in September 2009, when P.L.H. was almost five years old, she was seriously injured in an auto accident. *Id.* at p. 31 and 123, and GAL Report, p. 2. P.L.H.'s mother was killed in the accident, and P.L.H. was the only person who survived among those in the two involved vehicles. *Id.*

{¶ 21} As a result of these multiple issues, P.L.H. was diagnosed as being on the autism spectrum and with post-traumatic stress disorder ("PTSD"), oppositional defiance

disorder ("ODD"), and attention deficit hyperactivity disorder ("ADHD"). Tr. at p. 30 and 38. In 2011, Father remarried, and P.L.H. attended a traditional school in Tennessee, where she had a personal assistant who was dedicated to keeping P.L.H. in inclusion in classes. *Id.* at p. 30 and 32. From 2010 to 2016, P.L.H. also saw a family therapist and was on medication. *Id.* at p. 31-32.

{¶ 22} P.L.H. had behavioral issues, including aggression at school, stabbing another child with a pencil, and screaming in public. Father's wife, M.H., became stressed at dealing with all of P.L.H.'s issues. *Id.* at p. 30, 31, 33, 37, 131, 180, and 189. One technique that Father and M.H. used in connection with P.H's behavior was to cover P.L.H.'s mouth with their hands. *Id.* at p. 46 and 180. According to Father, this was done out of courtesy to other people and to avoid causing a panic, such as in a movie theater. *Id.* at p. 180. Another technique they used was to push P.L.H. to do things she feared. For example, M.H. forced P.L.H. to get on an escalator at a mall, knowing that P.L.H. was afraid of escalators. *Id.* at p. 47 and 178-179.[1]

{¶ 23} After P.L.H. was born in September 2004, P.L.H. and her mother lived with Grandmother for several months, until they moved with Father to Michigan, where they stayed for a few years before moving to Tennessee. *Id.* at p. 27 and 125. After P.L.H.'s

---

[1] During interviews with the GAL, P.L.H. stated that her stepmother, M.H., had covered her mouth and that she felt she could not breathe. In addition, P.L.H. told the GAL that her stepmother hit her, yelled at her, and called her names. P.L.H. also related that she was forced to go up an escalator and was crying and screaming, but M.H. pulled her arm and forced her to get on. Tr. at p. 78. Grandmother witnessed this event, and stated that M.H. was very aggressive, yanking P.L.H. onto the escalator and clapping her hand over P.L.H.'s mouth so that P.L.H. would not make noise. *Id.* at p. 147-148. Father denied that M.H. had put her hand over P.L.H.'s mouth on this particular occasion, but admitted that M.H. had forced P.L.H. to go up the escalator and had placed her hand over P.L.H.'s mouth numerous other times. *Id.* at p. 46-47, 179-180, and 195.

mother died in 2009, Grandmother's visits with P.L.H. increased, especially in 2013 to 2016. *Id.* at p. 27. In particular, Father would send P.L.H. to Ohio to visit for weeks at a time when P.L.H. had summer vacation, although not for the entire summer. *Id.* at p. 28. Grandmother saw P.L.H. at every possible opportunity, including driving to Tennessee to see her. *Id.* at p. 124 and 127.

{¶ 24} There was a dispute as to how P.L.H. came to live with Grandmother in Ohio on May 22, 2018. According to Father, P.L.H. had been asking to live with Grandmother and Grandmother had been asking P.L.H. to come. Father thought that having P.L.H. there would benefit Grandmother, who had lost her husband, daughter, and mother in a short period of time. Tr. at p. 30 and 173. Another reason Father gave was that additional resources were available for P.L.H. in Ohio as compared to Tennessee. *Id.* at p. 39.

{¶ 25} In contrast, Grandmother testified that Father called her and said that she needed to take P.L.H. or he would put her in a group home somewhere because having P.L.H. was not fair to his wife. *Id.* at p. 124. Grandmother said she would take P.L.H., but wanted her to finish the school year first. *Id.* About two or three weeks later, on May 22, 2016, Father brought P.L.H. to Grandmother's house. *Id.* In May 2016, Father also executed and filed a grandparent's POA with the Greene County Common Pleas Court. *Id.* at p. 30. When Grandmother learned that P.L.H. would be coming, she researched where P.L.H. should go for school for her autism and found Summit Academy. *Id.* at p. 129.

{¶ 26} Within a month after P.L.H. arrived, Grandmother had enrolled her at Summit Academy, which is a school for alternative learners that provides therapeutic

education. *Id.* at p. 17-18. Classrooms use small groups, and the student teacher ratio consists of about 18 to 20 students for two teachers – a special education teacher and a general education teacher. *Id.* at p. 18. Typically, the school is for students who are not able, perhaps, to do well in traditional school, and the school also teaches life skills or independence. *Id.*

{¶ 27} Part of P.L.H.'s condition is that she does not adjust well to change. *Id.* at p. 11, 77, and 134. When Father dropped P.L.H. off, she was happy, but shortly thereafter began showing very aggressive tendencies toward Grandmother and Grandmother's animals. *Id.* at p. 127. As a result, in July 2016, P.L.H. began seeing Courtney Love, a licensed mental health professional counselor with Family Solutions. Tr. at p. 4-5. P.L.H. also saw Dr. Mathias, who worked hand-in-hand with Love. *Id.* at p. 5-6. P.L.H. was diagnosed as having autism spectrum disorder, ODD, PTSD, and ADHD, and was prescribed the same medicine she had been on, but with a different dosage. *Id.* at p. 6, 32, and 131.

{¶ 28} P.L.H. had pretty severe behavioral issues when she first saw Love. *Id.* at p. 7. P.L.H. could be physically aggressive, especially toward the animals at home, was very defiant, had a lot of anxiety, had trouble expressing her feelings, needed a lot of support, and had a lot of academic concerns. *Id.* Love saw P.L.H. consistently at least twice a month for two years, and Love testified that P.L.H. had done a "180" since Love began seeing her. *Id.* at p. 8. Love stated that seeing P.L.H.'s personality come out had been very nice, and that P.L.H. had really started to connect with her. Love stated that P.L.H. had a great sense of humor, was doing wonderfully with the animals at home, was well-thought-of at school, and had accomplished all kinds of activities she never

could have done before starting services. *Id.*

{¶ 29} As indicated, P.L.H. was also enrolled in school at Summit Academy. At first, P.L.H. was aggressive with teachers and other students. *Id.* at p. 131. These were behavioral issues P.L.H. previously had in Tennessee. *Id.* at p. 37.

{¶ 30} Jillyan Holman, a behavioral specialist employed at Summit Academy, first met P.L.H. in August 2016. *Id.* at p.17-18. Holman described P.L.H. as pretty withdrawn and aggressive with teachers and students. P.L.H. also refused to do work, making it a challenge for teachers to have her comply. *Id.* at p. 19. Holman counseled P.L.H. between October 2016 and October 2018, when she discharged P.L.H. from her caseload because P.L.H. had met her goals, which were coping with stressful situations and frustrations. *Id.* at p. 19. Holman described P.L.H. as doing "tremendously better" than when she was first enrolled at Summit. *Id.* at p. 22.

{¶ 31} According to Holman, Grandmother had been involved in P.L.H.'s education by attending IEP meetings and evaluation team meetings and by coming to school when needed. Grandmother had a positive relationship with P.L.H. and was always available to talk to P.L.H. or pick her up if the school called. Tr. at p. 20-21. In contrast, Father had not been involved in P.L.H.'s education, had never contacted Holman to talk about P.L.H., and, to Holman's knowledge, had not been involved in any IEP meetings. These meetings set a child's goals for the coming school year, identify where staff feel a child has progressed, and outline interventions and special services that will be provided. *Id.*

at p. 20, 22, and 75-76.[2]

{¶ 32} In order to assist with P.L.H.'s behavior, Grandmother and P.L.H.'s therapist, Love, also arranged for P.L.H. to attend the Youth Recovery Program ("YRP") at Family Solutions.   YRP is an outpatient treatment program in which youths receive four hours of group therapy every day, as well as individual and family counseling. P.L.H. was involved in that program for eight to 10 weeks and successfully completed it, which helped her behavior.   *Id.* at p. 7, 128, and 131.

{¶ 33} Again, Grandmother was very involved in P.L.H.'s therapy and treatment by scheduling appointments, attending sessions, and collaborating with Love to make sure any concerns were addressed and that P.L.H. obtained needed services.   *Id.* at p. 9.   In contrast, Father never contacted Love to see how P.L.H. was doing and was not involved in the counseling.   *Id.* at p. 8.[3]

{¶ 34} As noted, Grandmother filed a complaint with the juvenile court on July 22, 2018, seeking legal custody of P.L.H. and an order of support.   At trial, the parties disputed the circumstances giving rise to the litigation.   According to Grandmother, she had approached Father a week earlier to ask if he would contribute some money for P.L.H.'s babysitting expenses.   As part of the agreement for P.L.H.'s care, Father had

---

[2] Father did attend one IEP meeting by phone, for the 2018-2019 school year, which was after litigation began.   Tr. at p. 34, 75, and 132.   Father stated that he did not previously attempt to attend these meetings or other parent/teacher meetings because the purpose of giving Grandmother the power of attorney was to have her assume these responsibilities.   *Id.* at p. 34-35 and 41.

[3] As with P.L.H.'s schooling, Father said he had delegated this responsibility to Grandmother.   Tr. at p. 40-41.

turned over P.L.H.'s survivor's benefit of about $500 a month to Grandmother. [4] However, in the two years after P.L.H. came to Ohio, Father furnished no money for P.L.H.'s support, babysitting, or extra-curricular activities, other than $100 in cash that he gave Grandmother on two occasions. *Id.* at p. 48-49 and 139-141.

**{¶ 35}** According to Grandmother, Father was adamant that he would not give her any more money and stated that, rather than doing so, he would take P.L.H. back to Tennessee. Tr. at p. 141. She interpreted this as a threat. *Id.*

**{¶ 36}** Father agreed that he and Grandmother discussed providing additional financial support for P.L.H. *Id.* at p. 59. However, Father denied that Grandmother's request had anything to do with his revocation of the POA after Grandmother filed the custody complaint. *Id.* at p. 58. Instead, he said he had previously thought about revoking the POA, but just did not follow through. *Id.* at p. 51. Father also testified that the survivor benefit was more than adequate for P.L.H.'s care. *Id.* at 48.

**{¶ 37}** Before Father revoked the POA, he and Grandmother had agreed that Father would take P.L.H. to Tennessee for a few weeks for a summer visit. *Id.* at p. 51-52, 60, and 142. However, when Father came to Ohio to pick up P.L.H., he had no intention of bringing her back. Instead, he was going to enroll P.L.H. in a traditional public school in Tennessee and have her resume services with the counselor and doctor she had previously seen. *Id.* at p. 42.

**{¶ 38}** Father did not notify either Grandmother or P.L.H. of his intention before he picked P.L.H. up. *Id.* at p. 53. He presumed that P.L.H. would be coming home to

---

[4] Father claimed this amount was $600 per month, and Grandmother claimed $500. The amount the juvenile court used for calculating Father's support credited him with $6,000 per year (or $500 per month) towards his support obligation.

Tennessee after the August 6, 2018 hearing and that a conversation with Grandmother, therefore, would be unnecessary. *Id.* at p. 53.

**{¶ 39}** When Father told P.L.H. what was going to occur, she was upset. *Id.* at p. 54. Grandmother then learned from P.L.H. that Father was not bringing her back to Ohio. *Id.* at p. 143. As a result, Grandmother filed an emergency motion with the court, which ordered Father on July 31, 2018, to immediately return P.L.H. to Ohio. However, Father did not comply with the court's order. Father also arranged on August 3, 2018, to have P.L.H.'s school records transferred to the public school he had selected in Tennessee, and to have her records transferred to P.L.H.'s doctor in Tennessee. *Id.* at p. 58. It was only after the previously-scheduled hearing on August 6, 2018, that Father turned over P.L.H. to Grandmother.

**{¶ 40}** Although Father was aware that P.L.H. had special needs, he did not believe it was in her best interest to contact her current therapist to discuss the potential impact of a move to Tennessee. Tr. at p. 55. Father's position during the custody hearing was that he had the right as a parent to decide what was best for P.L.H. and that his decision and P.L.H.'s interests were one and the same. *Id.* at p. 188.

**{¶ 41}** As noted, the juvenile court appointed a GAL. After conducting an investigation, the GAL filed a report and recommendation on October 16, 2018, recommending that the court grant legal custody to Grandmother. The GAL also attended the custody hearing and testified to the same effect.

**{¶ 42}** At the hearing, the GAL described P.L.H. as "very outgoing, friendly, happy; just a very sweet, lovely girl." She stressed this was in marked contrast to the child who was described in 2016. Tr. at 65. The GAL also emphasized that other people besides

Grandmother had described the tremendous difference in P.L.H. This caused concern over the adequacy of Father's care, because the difference was stunning. *Id.* at p. 71.

{¶ 43} In addition, the GAL noted that she and Father had discussed P.L.H.'s special needs. Father did not seem completely aware of P.L.H.'s needs and had somewhat of a lack of understanding. *Id.* at 73-74. Furthermore, the GAL had concerns about Father's ability to parent and about the relationship between P.L.H. and her stepmother. *Id.* at p. 78. Based on her investigation and the evidence, the GAL found that placing P.L.H. with Father would be detrimental to P.L.H. *Id.* at p. 78-79.

{¶ 44} In light of the above evidence, the juvenile court did not abuse its discretion in awarding legal custody to Grandmother. The court was rightly concerned about Father's decisions. Specifically, when P.L.H. moved to Ohio from Tennessee, she exhibited severe behavior and dysfunction in many areas. After being with her Grandmother and receiving the assistance of therapy and the schooling at Summit Academy, P.L.H. made tremendous strides in her behavior and outlook. Despite these very positive outcomes and P.L.H.'s desire to remain where she had been so successful, Father's intent was to return P.L.H. to a situation (public school, a counselor, and a home environment) that were quite unsuccessful previously.

{¶ 45} Contrary to Father's assertion, the court's decision was not based on a conclusion that Grandmother was "better-suited" than Father. Instead, the court's concern, and properly so, was the detriment to P.L.H. that would be caused if she were returned to a situation that was obviously harmful. Father is also incorrect in stating that abuse or egregious conduct was required. There is also no "magic" impact of the terms "suitable" or "unsuitable." The statement in *Perales* was that "an award of custody to the

parent would be *detrimental to the child*." (Emphasis added.) *Perales*, 52 Ohio St.2d 89, 369 N.E.2d 1047, at syllabus. If detriment would occur, a parent is deemed unsuitable, for legal purposes, even if the parent is not abusive.

{¶ 46} As an example, custody was properly awarded to a grandparent when "an award of legal custody to the father would be adverse to the children because it would require another change in their lives. Losing their mother and being moved from place to place to live with family members caused traumatic change in the children's lives. Thus, the amount of time the children spent with their grandmother had established stability in their lives. The GAL also testified that the children expressed a desire to continue to live with their grandmother and visit their father." *S.M.*, 160 Ohio App.3d 794, 2005-Ohio-2187, 828 N.E.2d 1044, at ¶ 8.

{¶ 47} There was no indication in *S.M.* that the father had abused the children or had committed egregious acts. Instead, the father "rarely attended the children's extracurricular activities, did not attend parent/teacher conferences, and failed to maintain child support during unemployment." *Id.* at ¶ 17.

{¶ 48} Father also complains that the juvenile court improperly relied on hearsay in the GAL's report. As an example, he notes that his wife, M.H., did not testify at the hearing and did not corroborate the abuse allegations or relationship issues. However, an alleged abuser would hardly be likely to corroborate allegations of abuse. Father was also free to call any witnesses he wished, including M.H., but he chose not to do so.

{¶ 49} More importantly, Grandmother specifically testified that she saw M.H. engage in physical and mental actions toward P.L.H. that were very aggressive and inappropriate. Father denied that M.H. held her hand over P.L.H.'s mouth during the

escalator incident. However, he did admit that M.H. forced P.L.H. to go on the escalator and that he and M.H. had placed their hands over P.L.H.'s mouth in public numerous times. Consequently, there was direct evidence of these matters.

{¶ 50} We have often stressed that "[c]redibility of witnesses and the weight to be given their testimony are primarily matters for triers of facts to resolve." *Buckeye Retirement Co., LLC v. Busch*, 2017-Ohio-4009, 82 N.E.3d 66, ¶ 55 (2d Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). This is "[b]ecause the factfinder, be it the jury or, as in this case, the trial judge, has the opportunity to see and hear the witnesses * * *." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). As a result, "[t]he decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *Id*. *Accord Buckeye Retirement* at ¶ 56. The juvenile court, therefore, could chose to believe Grandmother's testimony, and we defer to its credibility decisions.

{¶ 51} As a final note, Father contends that the court erred in failing to consider evidence about a few suggestive photos of Grandmother and her boyfriend that Father found on P.L.H.'s iPad. There was no evidence that P.L.H. saw these items, and they appear to have been accidentally uploaded from Grandmother's phone due to her lack of technological skill. GAL Report (Oct. 16, 2018). They also apparently did not affect P.L.H.'s significant progress, nor did they relate to or mitigate the detriment that would be caused by returning P.L.H. to Father's custody. Consequently, the court did not abuse its discretion by giving little weight to these facts.

{¶ 52} Based on the preceding discussion, the court's decision was supported by

sound reasoning and was not arbitrary or capricious. Accordingly, Father's sole assignment of error is overruled.

## III. Conclusion

**{¶ 53}** The judgment of the juvenile court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and HALL, J., concur.

Copies sent to:

Dalma C. Grandjean
James D. Miller
April H. Moore
Hon. Amy H. Lewis