**[Cite as *[J.S.] v. [K.V.]*, 2022-Ohio-487.]**

## IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## CLARK COUNTY

| | | |
|---|---|---|
| [J.S.], et al. | : | |
| | : | |
| Plaintiffs-Appellees | : | Appellate Case No. 2021-CA-15 |
| | : | |
| v. | : | Trial Court Case Nos. 2019-JUV-96 |
| | : | |
| [K.V.] | : | (Appeal from Common Pleas Court-Juvenile Division) |
| | : | |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 18th day of February, 2022.

. . . . . . . . . . .

JUSTIN C. NIDIFFER, Atty. Reg. No. 0091997, 10532 Success Lane, Dayton, Ohio 45458
        Attorney for Plaintiffs-Appellees

JAMES D. MILLER, Atty. Reg. No. 0080357 and DALMA C. GRANDJEAN, Atty. Reg. No. 0024841, 110 North Main Street, Suite 1200, Dayton, Ohio 45402
        Attorneys for Defendant-Appellant

. . . . . . . . . . . .

WELBAUM, J.

**{¶ 1}** Defendant-Appellant, K.V. ("Mother") appeals from a trial court order awarding legal custody of her daughter, S.V., to Plaintiffs-Appellees, J.S. and K.S. ("John and Kim").[1]   According to Mother, the trial court abused its discretion when it gave legal custody to John and Kim, who are nonparents, because Mother is a suitable parent.

**{¶ 2}** We conclude that the trial court did not abuse its discretion in granting legal custody of S.V. to Appellees.   Ample evidence indicated that giving Mother legal custody would be detrimental to S.V.   Accordingly, the judgment of the trial court will be affirmed.

## I.   Facts and Course of Proceedings

**{¶ 3}** On April 4, 2019, Appellees filed a complaint for custody in the juvenile court, asking the court to declare that S.V. was a dependent child.   They also asked to be designated legal custodians for S.V. due to Mother's unsuitability.   The same day, Appellees filed a motion seeking emergency and interim custody of S.V.   In the motion, they alleged that they had cared for S.V. more than 50% of the time since July 2015, that Kim and Mother had a mother-daughter relationship, and that S.V. was in significant danger while in Mother's care for several reasons.   These reasons included Mother's failure to provide for S.V.'s basic needs and Mother's relationship with a convicted sex offender, whom Mother allowed to provide care for S.V.

**{¶ 4}** The trial court initially denied the motion for emergency custody and set a non-evidentiary pretrial for April 24, 2019, noting that it would rule on the temporary

---

[1] These are not Appellees' real names.   To ensure the child's privacy, we will use pseudonyms or initials where appropriate.   We will also refer to John and Kim collectively as "Appellees."

custody request at that time. At Mother's request, the pretrial hearing was rescheduled for April 29, 2019. After that hearing, the court filed an entry ordering that Mother be the temporary legal custodian of S.V. and granting visitation to Appellees. The court also scheduled evidentiary hearings and appointed a guardian ad litem (GAL).

{¶ 5} On June 19, 2019, the court ordered that Appellees would have visitation with S.V. on June 23, 2019 and June 30, 2019, and that the GAL would provide the court with a recommendation on interim visitation. On July 15, 2019, the court filed an interim visitation order, stating that Appellees would have visitation with S.V. every other weekend from Friday at 6:00 p.m. until Sunday at 6:00 p.m.

{¶ 6} In August 2019, the court granted Appellees' request that the Ohio Department of Rehabilitation and Correction release all communication, including video calls, between Mother and inmate Travis D. (the convicted sex offender). The court further ordered that Travis not have any contact with S.V., in person or otherwise, and that Mother not permit any such contact. Entry and Order (Aug. 20, 2019), p. 1-2.

{¶ 7} On September 4, 2019, Appellees filed a motion to show cause and motion to increase visitation. In the motion, Appellees alleged that Mother had violated the interim visitation order. They also asked for additional visitation because Mother was pregnant and Travis, the father of the unborn child, was due to be released from prison and had been communicating with Mother. A show cause order was issued and a hearing was set for November 4, 2019. Following this hearing, a magistrate held Mother in contempt and sentenced her to three days of incarceration, suspended on the condition that she purge the contempt by complying with court orders for one year.

{¶ 8} After holding evidentiary hearings on several days, the trial court filed an

order on February 9, 2021, granting legal custody of S.V. to Appellees. In its decision, the court found that Mother was unsuitable to serve as S.V.'s legal guardian and that awarding custody to Mother would likely result in harm to S.V. Entry (Feb. 9, 2021), p. 17. Mother then filed a timely appeal.

## II. Alleged Abuse of Discretion in Granting Legal Custody

{¶ 9} Mother's sole assignment of error states that:

> The Trial Court Abused Its Discretion By Awarding Legal Custody of the Minor Child, S.V., to a non-parent non-relative.

{¶ 10} Under this assignment of error, Mother sets out a lengthy discussion of cases involving the test for awarding custody to nonparents, and she argues that the trial court could not have found her unsuitable as a parent because she had stable housing, consistent employment, health insurance, an established family relationship and family ties, and a bond with S.V. Mother further argues that the trial court erred in emphasizing Mother's perceived character and moral flaws.

{¶ 11} Before addressing these issues, we will briefly outline the standard of review. In reviewing legal custody decisions, we will reverse only if the lower court has abused its discretion. *In re I.R.*, 2d Dist. Montgomery No. 28160, 2019-Ohio-2037, ¶ 7. An abuse of discretion "implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). However, "most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157,

161, 553 N.E.2d 597 (1990). "A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue de novo, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result." *Id.*

{¶ 12} Where child custody proceedings are "between a parent and a nonparent, the hearing officer may not award custody to the nonparent without first making a finding of parental unsuitability[,] that is, without first determining that a preponderance of the evidence shows that the parent abandoned the child, that the parent contractually relinquished custody of the child, that the parent has become totally incapable of supporting or caring for the child, or that an award of custody to the parent would be detrimental to the child." *In re Perales*, 52 Ohio St.2d 89, 369 N.E.2d 1047 (1977), syllabus. *See also I.R.* at ¶ 8.

{¶ 13} "If a court concludes that any one of these circumstances describes the conduct of a parent, the parent may be deemed unsuitable, and the state may infringe upon the fundamental parental liberty interest of child custody." *In re S.M.*, 160 Ohio App.3d 794, 2005-Ohio-2187, 828 N.E.2d 1044, ¶ 11 (8th Dist.). Notably, the focus of the last prong (that custody to the parent would be detrimental) is on "the harmful effect of the [parental] custody on the child, rather than [on] * * * society's judgment of the parent * * *." *Perales* at 98. As we have stressed, under *Perales*, the court's "focus must be on the detriment, or harm, to the child, as opposed to a value judgment about [the parent's] morality, character, or lifestyle." *In the Matter of R.R.S.*, 2d Dist. Greene No. 2016-CA-25, 2018-Ohio-990, ¶ 8.

{¶ 14} Notably, legal custody differs significantly from, and is "not as drastic a remedy as, the termination of parental rights, because the parent still retains residual rights 'including, but not necessarily limited to, the privilege of reasonable visitation, consent to adoption, the privilege to determine the child's religious affiliation, and the responsibility for support.' " *In re S.P.*, 2d Dist. Champaign No. 2021-CA-15, 2021-Ohio-4335, ¶ 13, quoting R.C. 2151.011(B)(50) and R.C. 2151.353(A)(3)(c). Consequently, a preponderance of the evidence standard applies. *Id.* This is defined as " 'evidence which is of a greater weight or more convincing than the evidence which is offered in opposition to it.' " *In re Starks*, 2d Dist. Darke No. 1646, 2005-Ohio-1912, ¶ 15, quoting *Black's Law Dictionary* 1182 (6th Ed.1998).

{¶ 15} An additional consideration is witness credibility. We have often stressed that "[c]redibility of witnesses and the weight to be given their testimony" are primarily matters for trier of fact to resolve. *Buckeye Retirement Co., LLC v. Busch*, 2017-Ohio-4009, 82 N.E.3d 66, ¶ 55 (2d Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). This is "[b]ecause the factfinder, be it the jury or, as in this case, the trial judge, has the opportunity to see and hear the witnesses * * *." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). Consequently, "[t]he decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *Id.; accord Buckeye Retirement* at ¶ 56; *In the Matter of P.L.H.*, 2d Dist. Greene No. 2021-CA-6, 2021-Ohio-3522, ¶ 50.

{¶ 16} In arguing that the trial court erred, Mother pays little attention to the trial court's credibility decision and the predominant factors in this case, which were Mother's

deception, her continued relationship with Travis, a violent, convicted rapist and Tier III sex offender, and her decision to expose her children, including S.V., to this individual, which placed her relationship above the children's welfare.

{¶ 17} At the time of the final hearing in this case on January 27, 2021, Mother was 30 years old. Transcript of Proceedings[2] (Tr.5), p. 94. Mother had four children, with four different fathers to whom she was not married. Tr.1 at p. 135. Mother's first child, S.V.1, was born in February 2010; Mother and S.V.1's father do not have court-ordered parenting time or child support, but they are able to cooperate. S.V.1's father, Chris, has parenting time every week from Thursday afternoon to Sunday evening. Tr.2 at p. 71-74.

{¶ 18} Mother's second child, N.V., was born in March 2011. N.V.'s father, Josh, was granted legal custody of N.V. in early 2013. In awarding Josh custody, the court noted "serious problems with Mother's willingness to facilitate parenting time," and that Mother "had not acted in the child's best interest but in such a way as to serve her own needs by denying the Father contact with the child." Tr.2 at p. 14; Plaintiff's Ex. 24 (*In re N.V.*, Montgomery J.C. No. G 2011-1481 01, 0A (Feb. 1, 2013 Magistrate's Decision and Judge's Order)), p. 2.

{¶ 19} In June 2017, Josh filed a motion asking the court to suspend Mother's visitation and for an order prohibiting Travis from having any contact with N.V. Plaintiff's Ex. 23 (*In re: N.A.L.V.*, Montgomery J.C. No. H 2012-1481-OH, 01 (June 27, 2017)), p. 1. The motion to suspend visitation time was withdrawn, and the court granted the

---

[2] Because the transcripts for the five days of hearings are not sequentially numbered, we will refer to them as "Tr.", followed by a number, i.e., "Tr.1", "Tr.2", and so on.

motion prohibiting contact. *Id.* In this regard, the court stated that "[i]f mother allow [sic] Travis * * * to have any contact with the child during her parenting time, it will be suspended immediately." *Id.*

{¶ 20} S.V. is Mother's third child and was born in May 2015. Tr.4, p. 11. S.V.'s father is Matthew, a soccer player from England. Mother became pregnant while Matthew was in the United States for a summer. Paternity had never been established, and Matthew had had no contact with S.V. Tr.1 at p. 182; Tr.4 at p. 12-13; Tr.5 at p. 94.

{¶ 21} Mother later had a fourth child with Travis.

{¶ 22} Kim had known Mother since Mother was about four years old (around 1995). Tr.1 at p. 112. Kim and Mother's own mother, M.D., had worked together at Cadillac Jack's and became friends. *Id.* at p. 125; Tr.2 at p. 91-92. Kim and Mother developed a close relationship when Mother was little, but at some point, Kim stopped speaking to M.D. because M.D. was having an affair with a married man who abused her children. That man ended up in prison for these actions. Another boyfriend of M.D. had sexually abused Mother. Tr.1 at p. 125, 153, and 157; Tr.4 at p. 65.

{¶ 23} Around 2010, Kim and Mother were thrilled when they reconnected while working at Steak and Shake. Kim was a manager in training and Mother was a server. Tr.1 at p. 126, 153, and 157. In 2013, Kim also employed Mother as a fill-in waitress at a bar Appellees had purchased. *Id.* at p. 127, 144, and 146; Tr.4 at p. 12. Kim and Mother had always had a bond and became close. Tr.1 at p. 112 and 157; Tr.4 at p. 9. During Mother's pregnancy with S.V., they discussed plans for S.V.'s care when Mother went back to work, and the plan was for S.V. to stay with Appellees. Tr.1 at p. 146 and Tr.4 at p. 9. About a week before S.V. began to come to Appellees' house, Kim's adult

son (and John's stepson) died.   Tr.1 at p. 146 and 183.   The parties agreed that taking care of S.V. was beneficial in Appellees' grieving process and was also helpful to Mother. *Id.*; *see also* Tr.4 at p. 10.

{¶ 24} S.V. was born in May 2015, and Appellees began babysitting her in July 2015.   Consistent with Mother's schedule with her other children, Appellees took care of S.V. every Thursday through Sunday, including overnights.   After three of four weeks of this, Mother asked Appellees to become a bigger part of S.V.'s life because S.V. did not have a father in her life.   Tr.1 at p. 112-113.   Over time, the visitation increased, but at a minimum, it was Thursday through Sunday, and sometimes included Wednesday, straight through with overnights.   When S.V. was with Appellees, Mother did not come to see her.   *Id.*   Appellees never asked Mother for any money for taking care of S.V.   Tr.2 at p. 102.   They also paid the part of S.V.'s preschool expenses that Mother's assistance did not cover.   Tr.1 at p. 139-140.

{¶ 25} In 2016, Appellees took care of S.V. six days a week while Mother was taking classes at a community college.   S.V. has her own bedroom, clothing, and toys at Appellees' house, and spent three of four Christmases with them, as well as Thanksgiving and Halloween.   Appellees also took S.V. alone on vacation for a week, and in 2017, took both S.V. and Mother on vacation.   *Id.* at p. 114-117 and 119.   In 2018, S.V. stayed with Appellees full-time between December 7 or 8 through New Year's; Mother showed up on Christmas Day, took S.V. for several hours, and then brought her back.   *Id.* at p. 114-115.   S.V. referred to Kim as "Grandma" and to John as "Papa."   *Id.* at p. 123.

{¶ 26} Between May 2015 and March 2019, Kim and Mother had a close relationship.   Both Kim and John considered Mother like family and were extremely

involved in S.V.'s life.   *Id.* at p. 112 and 164; Tr.5 at p. 29.   Mother came to Kim with her problems, and Kim was Mother's support person.   Tr.1 at p. 112, 122, 153, and 157.

{¶ 27} At some point before April 2017, Mother met Travis, who, as noted, is a convicted rapist.   After pleading guilty to a first-degree felony rape of a girlfriend in Preble County, Ohio, Travis tried to entice an ex-girlfriend from Pennsylvania to come live with him in Indiana; if she refused, he was going to put out a sex tape or some information on social media.   While awaiting sentencing on the rape conviction, Travis drove to Pennsylvania and was found by the police outside the ex-girlfriend's home with a fake license plate taped over his own plate and a handgun in his car.   Tr.1 at p. 38-39; Joint Ex. 1 (Nov. 21, 2019 GAL report), p. 7-8.

{¶ 28} In connection with the Pennsylvania incident, Travis had 2011 convictions for firearms possession and stalking; repeatedly communicating to cause fear; identity theft; coercing/threatening to commit crime; selling obscene/sexual materials; loitering and prowling at night; receiving stolen property and fraudulent use/removal of license plate.   He also had 2011 convictions for intimidating a witness or victim and two counts of terroristic threats with intent to terrorize another.   GAL Report at p. 7-8.

{¶ 29} After being returned to Ohio, Travis was sentenced to five years in prison and was classified as a Tier III sex offender with a lifetime registration requirement.   He was imprisoned in Ohio from August 31, 2011 until August 10, 2016, when he was released, subject to five years of post-release control.   *Id.* at p. 7.   *See also* Tr.1 at p. 36; Tr.5 at p. 35; Plaintiff's Ex. 16; and Plaintiff's Ex. 20.

{¶ 30} Mother and Travis met in 2017 and began dating (per her account) in April 2017.   Appellees were not aware of the relationship until May 2017, when they

vacationed with Mother and S.V. in Florida. Appellees drove with S.V. to Florida, and Mother flew down two days later. Mother did not have her phone; she said she and her boyfriend had gotten in an argument and the phone had been broken. However, she claimed not to know how it had been broken. Tr.1 at p. 120-121.

{¶ 31} When Kim asked Mother why she had not told them about the boyfriend, Mother said none of her friends approved of him and no one wanted her to be with him. Mother further stated that her boyfriend had a record and was a sex-offender, but it was not a big deal. Mother then shut down and would not say anything more, including disclosing the offense of which he had been convicted. *Id.* at p. 121. After learning of Travis's background, Mother continued to allow him contact with her children. In fact, she said she had let him around her children "quite a bit after that" and had even let him be around her children after he had broken into her house following a breakup. Joint Ex. I at p. 6; Tr.1 at p. 22; Tr.5 at p. 39 and 65.

{¶ 32} As indicated, N.V.'s father went to juvenile court in June 2017 and obtained an order stating that Travis was not to be around N.V., and that if it occurred, Mother's visitation would immediately be suspended.

{¶ 33} On July 11, 2017, Mother signed an affidavit stating that she had executed a will providing that if she died while S.V. was still a minor, Appellees would be appointed guardians of S.V. and S.V.'s estate. The affidavit further stated that Kim had been a close personal friend of Mother and her family for more than 24 years. Plaintiff's Ex. 13; Tr.5 at p. 32. In addition, the affidavit stated that since S.V.'s birth, Appellees "have been extremely involved in [S.V.'s] life, and she spends several nights a week at their home." Ex. 13 at p. 1. It also said that, "[a]lthough not biologically related, [Appellees] have

essentially served as the role of [S.V.'s] grandparents." *Id.* Mother stated in the affidavit that she wished Appellees to be S.V.'s guardians if Mother were unable to do so or if Mother were "deemed incompetent, determined in any way to be unfit to be [S.V.'s] parent, or if for any other reason [S.V.] were removed from her custody." *Id.*

{¶ 34} While Appellees were concerned about Mother's relationship with Travis, they knew that Mother was not allowed to have Travis present when N.V., S.V.'s brother, was present. However, they later learned that Travis had been around S.V. a lot more they had been led to believe, and that Mother had let Travis babysit for S.V. Tr.1 at p. 118, 121, 130, 167-168, and 182. Appellees were also concerned about S.V.'s hygiene when she was with Mother and Mother's failure to attend to S.V.'s medical and sleep needs. *Id.* at p. 141, 156, 159, and 166.

{¶ 35} A few months after Kim found out about Travis, Mother would call Kim, upset, saying that they were fighting and that Travis would get violent. Mother claimed Travis had bugged her home and had put tracking devices in her phone. However, Mother and Travis would then make up and Mother would claim it had been a misunderstanding. Over time, the relationship became increasingly violent. Tr.1 at p. 122. In early 2018, Mother showed up at Appellees' house without shoes, wearing only a coat, bra, and sweatpants. It was cold out. At that time, Appellees had S.V. at their home. Mother was hysterical, claiming that she and Travis had gotten into a fight and that he was at her house and had taken her phone. Mother and Appellees lived about three minutes away from each other, so Mother had just run out of her own home and come to their house. *Id.*

{¶ 36} On November 28, 2018, Mother filed a petition for a domestic violence civil

protection order ("CPO") against Travis, which included both herself and her children, including S.V. An ex parte CPO was issued that day. Plaintiff's Exs. 10 and 11; Tr.3 at p. 80; Tr.5 at p. 56. In the petition, Mother listed Travis as a family or household member and checked that her relationship with him was that of a "[p]erson living as a spouse of Respondent," meaning "• now cohabitating; • or cohabitated within five years before the domestic violence." *Id.* at Ex. 10, p. 1.

{¶ 37} In the CPO petition, Mother stated, "I do not feel safe with Travis * * *. I fear for myself and my children." *Id.* at p. 2. She further said that the day before, Travis had tracked her location on an app and had showed up at her sister's workplace. Twenty minutes earlier, Travis had texted her to ask how her "date" at a particular place was, showing that he was tracking her. *Id.*; *see also* Tr.5 at p. 62. When Travis showed up at the workplace, he bashed in the window of Mother's car. Tr.3 at p. 33. At the time, Mother's sister was using the car. *Id.* at p. 44.

{¶ 38} In the CPO petition, Mother further recounted that, after she and Travis had broken up the previous weekend, Travis had tried to enter her home around 3:00 a.m. by using the keypad. He tried again a few hours later. Mother said she was "terrified because he has succeeded in the past at breaking [in] [and physically assaulting me while scream[ing] * * *." Ex. 10 at p. 2.

{¶ 39} However, on January 4, 2019, Mother voluntarily dismissed her petition for a CPO. *See* Plaintiff's Ex. 13; Tr.4 at p. 41. According to Mother, she dismissed the petition because Travis had talked to her and she did not feel that he had "done enough" to get a restraining order. He also he did not give her much of a reason to continue pursing it. At the time, Travis was still on parole for the 2011 conviction. Tr.4 at p. 38-

39.

{¶ 40} Between December 7, 2018 and January 1, 2019, Mother was doing commercial driver license training in Indiana.   Tr.1 at p. 128; Tr.3 at p. 25.   Appellees cared for S.V. during that time.   Although Mother claimed she and Travis had broken up in October 2018 and did not have a relationship after that, Mother became pregnant with Travis's child (S.V.3), who was born as a full-term baby on September 16, 2019, about 11 months after the breakup.   Tr.1 at p. 40-41, and 53; Tr.5 at p. 34.   Mother believed she got pregnant at the end of 2018 or the beginning of 2019, i.e., likely during the time she was "not" in a relationship with Travis and Appellees were caring for her child.   Tr.4 at p. 101.

{¶ 41} At some time before March 24, 2019, John asked Mother if he could talk to her about some of her decisions and possibly taking custody of S.V.   Tr.1 at p. 164.   The discussion lasted between three and five minutes, because Mother grabbed S.V. and took her outside without a coat or shoes.   *Id.*   John was angry and upset because he was concerned about S.V.'s welfare and Mother did not even want to discuss the subject.   *Id.* According to Mother, John told her he was going to drag her through the mud and bury her; John denied saying this, although he did admit he raised his voice.   Tr.4 at p. 20; Tr.1 at p. 179.   After this happened, Mother did not allow S.V. to go over to see Appellees.   Tr.2 at p. 122.   On April 4, 2019, Appellees filed the complaint seeking custody of S.V.

{¶ 42} A probation violation report dated September 20, 2019, stated that Travis's parole officer ("PO") received information on March 27, 2019, that Travis had threatened Mother and Josh's wife.   Plaintiff's Ex. 6, p. 2.   After obtaining police reports from three

jurisdictions, the PO discovered that Mother had told Riverside Police on November 25, 2018, that Travis had broken into her home after they broke up. The reason for the breakup was that Travis had choked Mother while driving a car. The PO further found out that Mother had contacted the Huber Heights Police on March 19, 2019, concerning a menacing complaint. After Travis reported to the probation department on March 28, 2019, he was arrested and taken to jail. *Id.*

{¶ 43} Following a hearing on April 24, 2019, Travis was found guilty of violating parole and was sentenced to 122 days in prison, effective April 24, 2019. Plaintiff's Ex. 9. Other sanctions included "No contact with [Mother] – No contact includes personal contact, phone, text, social media, third party, etc." *Id.* Neither Mother nor Travis complied with this order.

{¶ 44} The GAL listened to recordings of Mother's conversations with Travis while he was in a local jail in April 2019 and when he was in state prison for the parole violation. Mother and Travis spoke 25 times in April 2019 while Travis was in jail in Montgomery County. Joint Ex. I at p. 12. The prison calls that the GAL reviewed took place between May 24, 2019 and July 24, 2019. During that latter time period, Travis contacted Mother 367 times, and Mother answered the calls 230 times. Most calls lasted around 15 minutes. Joint Ex. I at p. 10, 12-13, and 17- 21.

{¶ 45} In its decision awarding Appellees legal custody, the trial court specifically stated that Mother's "testimony concerning her relationship with [Travis] is not at all credible." Entry (Feb. 9, 2020), at p. 12. The record contains many instances of Mother's deception and lies. For example, Mother told the GAL on May 22, 2019, that she was not in a relationship with Travis and that while he currently tried to contact her,

she refused to speak with him. Joint Ex. I at p. 5, 6, and 7. Contrary to this, Mother spoke with Travis while he was in jail and in state prison. In a call on April 11, 2019, Mother read Travis a statement she was going to give to the parole board. The statement said that she and Travis had a " 'permanent relationship' " and "described themselves as a 'family.' " Joint Ex. I at p. 12.

{¶ 46} Mother also told the GAL on May 22, 2019, that Travis had never assaulted her. Joint Ex. I at p. 5 and 8. However, in a prison call on June 25, 2019, Mother and Travis discussed the violence that had "occurred between them in the past." *Id.* at p. 20. Mother said "she was scared when Travis broke into her home and threw her across the bed" and "hurt her." *Id.* Mother also mentioned that "thereafter his behavior got 'worse and worse.' " *Id.* And, as noted above, other violence occurred many times during their relationship.

{¶ 47} Both in his report and in testimony during the custody hearings, the GAL recounted numerous troubling conversations that Mother and Travis had while Travis was in prison. Not only did Travis and Mother plan a life together, they also discussed ways to sabotage the relationship between S.V. and Appellees. As the GAL noted, Mother and Travis discussed "[p]rimarily how they're going to get a home, they were going to purchase a home, and then also how they can, you know, hide their relationship while he's still on parole * * *. They talked about potentially having another child together, * * * him getting work and supporting her financially, things like that." Tr.1 at p. 40.[3]

{¶ 48} Mother also discussed whether people could find out if they were talking,

---

[3] Both in his report and during the hearing, the GAL recommended that legal custody be given to Appellees. *See* Tr.1 at p. 15; Joint Ex. I at p. 22-23.

and they talked about changing contacts in Mother's phone so that people could not determine who she was talking to. Mother stated that she had Travis's phone number saved as "Lawyer" and said she wanted a phone that no one knew about. Joint Ex. I at p. 17.

{¶ 49} Mother and Travis also discussed manipulating S.V. Their discussion "[p]rimarily was regarding [S.V.'s] relationship with the [Appellees] and how * * * it was important for * * * trying to get [S.V.] to say she hated them or at least putting that idea in her head that * * * [Appellees] were trying to hurt her and [Mother] * * * and then try to poison her that way in her relationship with [Appellees]." Tr.1 at p. 44.

{¶ 50} As noted above, Mother refused to let Appellees see S.V. from late March 2019 until the court-ordered visitation on June 23, 2019. After visitation was ordered, Mother and Travis discussed ways to put Travis's name on S.V.'s birth certificate, giving him rights to S.V. so that he could do visitation exchanges with Appellees and "make them miserable." Joint Ex. I at p. 19; Tr.1 at p. 46. Consistent with the attempt to poison S.V. against Appellees, the GAL noted the following details of phone conversations between Mother and Travis:

> On June 20, 2019 [prior to the first visit], mother informs Travis that she told "her" to tell S.V. that [John] is gross and that he is going to hurt her. Mother tells Travis that she told "her" to tell S.V. that every time [John] gets into bed with her, he is going to do something bad to her and that she should be scared. This Guardian believes "her" is [Alice], another child that

mother cares for.[4]

On June 23, 2019 [the day of Appellees' first visit with S.V. since March], Mother tells Travis that when [John] came to the door for their initial visit with S.V. that [S.V.] started giggling and ran to him. Mother told Travis that S.V. jumped into [John's] arms and that [Kim] got out of the car and they were holding her and hugging her. Mother and Travis agree that turning S.V. against the [Appellees] will require "more extreme measures." From the conversation this Guardian believes that Mother has had another child, [Alice] tell S.V. negative things about the [Appellees]. During the conversation, Travis says that she [Mother] should start doing it. Mother responds that she cannot because if S.V. tells this Guardian that mother is telling her to say these things then she is done. Mother goes on to tell Travis that she told S.V. prior to the [Appellees] arriving that she did not want S.V. to go, that the [Appellees] are not good people and that they are not friends and they are not your family. Mother informed Travis that S.V. disagreed on all three statements.

Joint Ex. I at p. 19-20.

---

[4] S.V. co-slept with Appellees, because she was afraid to sleep alone. Tr.1 at p. 129. Also, Alice is not the child's real name. Alice is Mother's 10-year old cousin, who was being raised by Mother's mother, M.D. Tr. 2 at p. 99. M.D. sees S.V. frequently, and Mother and M.D. also babysit for each other's children when one of them is working. *Id.* at 94-95; Tr. 4 at p. 58. Alice, therefore, would have had regular contact with S.V. Mother told the GAL on May 22, 2019 that S.V. now called Appellees by their first names rather than Grandma and Papa, but she denied she had told S.V. to do this. Joint Ex. I at p. 8. A child of S.V.'s age (under four at the time) would not likely think of switching names on her own. At trial, M.D. admitted telling S.V. that Appellees were not S.V.'s family. Tr. 2 at p. 119-120.

{¶ 51} The GAL report detailed various other instances of Mother's attempts to poison S.V., such as refusing to sleep with S.V. or watch television with her if she wanted to go to Appellees' house and telling S.V. that "she is not going to sleep with S.V. because you would rather be with someone who wants to kill me." *Id.* at p. 19.

{¶ 52} These were not the only instances of deception and poisoning, but we need not discuss them further because the record clearly supports the GAL's observation that "the consistent theme of the conversations between mother and Travis [was] regarding their relationship future, how they can hide it with others and how they can destroy the relationship between S.V. and [Appellees]." *Id.* at p. 21-22.

{¶ 53} Travis was released from prison on the parole violation on August 24, 2019 and was still on parole. As part of his supervision conditions, he was ordered to have no contact with Mother. *See* Plaintiff's Ex. 5. Again, this included "no personal contact, phone, text, social media, third party, etc." *Id.*

{¶ 54} Appellees hired a private investigator, who documented Mother's whereabouts on a few occasions. The afternoon that Travis was released, Mother left her car in a church parking lot near Travis's home and disappeared from view while the investigator turned his car around. Her car remained in the parking lot overnight, and Travis was observed bringing Mother back to her car the next morning. *See* Plaintiff's Ex. 1A, photos 1-48; Tr.1 at p. 53-56, 62-63, and 68-75.

{¶ 55} On September 14, 2019, the investigator observed and photographed Mother's car parked in Travis's garage, with a cardboard or wooden board behind the car, obscuring the license plate. The investigator saw Mother leaving the house and also photographed Travis next to Mother's car while she was leaving his driveway. On

September 15, 2019, the car was again in the garage, again obscured, and Mother was once more photographed leaving the house. The car was followed to a Frisch's restaurant in Huber Heights (Mother was employed at Frisch's). Plaintiff's Ex. 1B and 1C; Tr.1 at p. 77-80.

{¶ 56} Mother gave birth to Travis's child on September 16, 2019. According to a Violation Report, Mother's sister called Travis's PO on September 19, 2019, and reported that a friend had seen Travis visiting and having contact with Mother in the hospital. When the PO visited the hospital, Mother admitted that Travis had been to her room to see the baby, but denied she had spoken to him. Plaintiff's Ex. 6, p. 1-3. On September 20, 2019, Travis reported to his PO's office and was arrested. He was charged with violations relating to the visits by Mother to his home and was held pending resolution of the violations. After a continuance was granted for further investigation, Travis was charged with three additional parole violations for September 18, 2019, relating to threats of physical harm and serious physical harm to Mother and violation of the no contract order. The physical harm violations were withdrawn at the hearing, and Travis was found guilty of the no contact violations; he was sentenced to a sanction of 154 days in prison. Plaintiff's Exs. 7 and 8.

{¶ 57} The second custody hearing in this case took place on February 26, 2020. At that point, Travis was scheduled to get out of prison in a few months. Tr.2 at p. 102. At the February 2020 hearing, Mother presented testimony from Cory W., who was Mother's then boyfriend and had been dating Mother since shortly after S.V.1 was born in September 2019. Id. at p. 33. According to Cory, they had been talking about moving in together and possibly getting engaged. Id. at p. 35-36.

{¶ 58} After Travis was released from prison in 2020, Mother saw him outside court proceedings and got in his car because he made threats to her. According to Mother, this was after a hearing related to a CPO. Mother indicated that she did file for a CPO in February 2020, and the permanent order was issued on December 7, 2020. Tr.4 at p. 44 and 46. In any event, Mother kept in contact with Travis for a few weeks but then cut it off. Tr.4 at p. 47-48.

{¶ 59} The third hearing in this case was held on July 7, 2020. A few days earlier, Travis came to a Kroger where Mother and Cory were shopping and hit Cory. Ex. 3 at p. 87; Tr.5 at p. 43-44 and 51. During her testimony several months later, Mother first said that Travis just randomly showed up at Kroger. She then said she had been talking to him, but insisted that she did not tell him where she was. *Id.* at p. 44-45.

{¶ 60} The police report, however, included Mother's statement that Travis had called her and asked what she was doing. Mother told him she was shopping at Kroger with Cory, and Travis then came there and hit Cory. Tr.5 at p. 49; Plaintiff's Ex. 44, Ohio Uniform Incident Report (July 5, 2020), p. 3. Cory told the police that he and Travis had been having issues over dating Mother and stated multiple times that he did not want to press charges. *Id.* Cory and Mother did not call the police about this incident; store employees were the ones who called. *Id.*

{¶ 61} Mother also told the officer that "both subjects have been talking about fighting for a while over her." *Id.*; Tr.5 at p. 49. Travis left before the police came but came back afterwards to see if charges were going to be pressed. Ultimately, there was another argument, because in Mother's words, "boys will be boys." During this argument, Travis came toward Mother at one point with his fists balled up and then left.

Tr.4 at p. 45.

{¶ 62} Although no charges were filed, Travis was arrested and booked into jail on July 6, 2020, for an alleged parole violation. Tr.3 at p. 43, and Defendant's Ex. A. By the time of the final January 2021 hearings, Mother was no longer with Cory, and Travis was again in jail, with an expected release date in February 2021. Tr.4 at p. 46 and 52-53.

{¶ 63} After hearing the evidence, the trial court issued a decision on February 9, 2021, granting legal custody of S.V. to Appellees. Contrary to Mother's claim, the court did not apply an incorrect test. The court explicitly stressed that it was "well aware that his case is not simply a 'best interest' test." Entry (Feb. 9, 2021), at p. 11. The court further stated that: "As a general rule, biological parents have the right to parent their own children, free of involvement of third parties. One exception to that rule is if the 'parenting' exercised by the biological parent is, or likely will be, detrimental to the child." *Id.* In addition, the court emphasized that Appellees' burden was substantial. *Id.*

{¶ 64} These are the correct standards for awarding custody to a non-parent. The court found, based on the *credible* evidence, that Mother was unable or unwilling to accept Appellees' substantial positive effect on S.V.'s life and that Mother had unresolved mental health issues. *Id.* at p. 12. The court was very concerned over Travis's imminent release from prison and found that Mother's testimony about their relationship was not credible. *Id.*

{¶ 65} Moreover, the court found that Mother had not prioritized S.V. in her decision-making process and that it would be detrimental for S.V. to remain in Mother's custody. *Id.* at p. 13. Based on our discussion above, we agree with the trial court on

all these points.   It is nearly beyond belief that Mother would continue a relationship with an individual who even one of her own witnesses described as a "psychopath" that "should stay in prison."   Tr.3 at p. 113.   There was no question that Mother's decisions in this vein, as well as the deliberate efforts of Mother and her family to poison the relationship between S.V. and people who had been a great benefit to her life, had already harmed S.V. and would continue to do so if she remained in Mother's custody.

{¶ 66} As a final point, we disagree with Mother's claim that the trial court improperly stressed her perceived character and moral flaws.   The court was properly focused on the effect Mother's choices regarding Travis had on S.V.'s welfare and how they could affect S.V. in the future.   This was not a moral judgment; it was a recognition of the danger to the child.

{¶ 67} Based on the preceding discussion, Mother's sole assignment of error is overruled.

### III.   Conclusion

{¶ 68} Mother's assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and EPLEY, J., concur.


Copies sent to:

Justin C. Nidiffer
James D. Miller
Dalma C. Grandjean
Matthew J. Barbato
Hon. Thomas J. Capper